UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JAMES O'CALLAGHAN,

                      Plaintiff,

– against –

UBER CORPORATION OF CALIFORNIA,

                      Defendant.

**OPINION AND ORDER**

17 Civ. 2094 (ER)

Ramos, D.J.:

James O'Callaghan, acting *pro se*, brings this action against Uber Technologies, Inc., sued herein as Uber Corporation of California. O'Callaghan, an Uber driver, alleges that Uber failed to inform him about his right to compensation under The Black Car Fund[1] for his injuries suffered as a result of a physical altercation with a New York City taxi driver, and that Uber incorrectly reported the incident to the New York State Compensation Committee.[2] Complaint ("Compl."), Doc. 2 at 2–7. In the instant motion, Uber moves to compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* (the "FAA"). Doc. 17. In response, O'Callaghan moved to deny arbitration and grant jury trial. Doc. 21. For the reasons set forth below, Uber's motion to compel arbitration is GRANTED and O'Callaghan's motion to deny arbitration and grant jury trial is DENIED.

---

[1] O'Callaghan alleges that Uber is a member of The Black Car Fund, which is part of the Workers' Insurance Compensation in New York State. Compl. at 4.

[2] The New York State Compensation Committee is not defined in the Complaint. The Court understands this entity to be the New York State Workers' Compensation Board, a government agency that "protects the rights of employees and employers by ensuring the proper delivery of benefits to [employees] that are injured or ill, and by promoting compliance with the law." *Basic Facts About the Board*, New York State Workers' Compensation Board, http://www.wcb.ny.gov/content/main/TheBoard/factsht.jsp (last visited June 26, 2018).

I.   **FACTUAL BACKGROUND**

   A. **The Allegations**

O'Callaghan was an Uber driver that provided his services through the company's smartphone application ("the Uber App"). Uber's Memorandum of Law in Support of Its Motion to Compel Arbitration ("Def.'s Mem."), Doc. 18 at 1. On February 19, 2014, O'Callaghan was driving to pick up a client when he was involved in a motor vehicle accident with a New York City taxi driver. Compl. at 2. The accident occurred on 39th Street between 2nd and 3rd Avenues. *Id*. As O'Callaghan exited his vehicle to examine damage, he was assaulted by the taxi driver. *Id*. O'Callaghan suffered severe headaches after the assault and went to see three different doctors for treatment. *Id.* at 3. Two of the doctors concluded that O'Callaghan suffered a concussion. *Id*.

On February 22, 2014, O'Callaghan notified Uber about the accident and the assault via text. *Id*. at 4. Subsequently, O'Callaghan sent five separate emails to Uber asking for legal help. *Id*. at 5–6. Upon learning in May 2016 that Uber was part of The Black Car Fund, O'Callaghan immediately filed the necessary papers requesting compensation for his injury. *Id*. at 3. On May 22, 2016, Katy Mason, an Uber employee, allegedly wrongfully informed the New York State Compensation Committee that O'Callaghan had never informed Uber of the February 19, 2014 incident. *Id*. at 4–5. O'Callaghan alleges that Mason denied the existence of the five emails and the text message he had previously sent to Uber. *Id*. at 6. On June 9, 2016, O'Callaghan contacted Mason and was informed that she would resend the letter detailing the accident to the Compensation Committee. *Id*. at 4. Mason allegedly never did so. *Id*. Instead, Mason submitted a letter with a chart showing the trips O'Callaghan took as an Uber driver on February 19, 2014, the date of the accident. *Id*. at 6, 12. O'Callaghan claims that this chart is fraudulent.

2

*Id*. at 6.

The Compensation Committee initially denied O'Callaghan's request and granted him a hearing. *Id*. at 3. With the assistance of an attorney, O'Callaghan was eventually able to receive $5,000 from The Black Car Fund. Response to Defendant's Request for Pre-Motion Conference on Motion to Compel Arbitration ("Pl.'s Resp."), Doc. 16 at 2. O'Callaghan alleges that Uber committed "fraudulent contract misrepresentation" because it failed to inform him of his right to compensation under The Black Car Fund and that it committed mail and wire fraud by submitting a fraudulent document to the Compensation Committee.[3] *See* Compl.

### B. Uber USA, LLC Technology Services Agreement

An Uber driver cannot access the Uber platform to generate leads for potential riders unless she electronically accepts the agreement to use the Uber App. Def.'s Mem. at 2. To gain access to the platform, she must "log in to the Uber App using a unique surname . . . and password selected by the driver to create an Uber account." *Id*. When a driver first activates the Uber App, she is presented with a screen containing a hyperlink to the operative agreement. *Id*. at 3. At the top of this screen, the Uber App states, "TO GO ONLINE, YOU MUST REVIEW ALL THE DOCUMENTS BELOW AND AGREE TO THE CONTRACTS BELOW." *Id*. The driver may review the agreement by clicking on the hyperlink. *Id*.

O'Callaghan first signed up to use the Uber App on or about February 25, 2013, and his

---

[3] Since the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* (the "FAA") does not automatically confer federal subject matter jurisdiction, there must be an independent basis of jurisdiction before this Court can entertain petitions under the FAA. *Durant, Nichols, Houston, Hodgson & Cortese–Costa P.C. v. Dupont*, 565 F.3d 56, 63 (2d Cir. 2009). Construed liberally, the complaint alleges that Uber submitted a fraudulent document regarding O'Callaghan's accident to the New York State Compensation Committee and therefore committed mail and wire fraud. Compl. at 5–6. Both mail fraud and wire fraud are federal offenses under 18 U.S.C § 1341 and § 1343, respectively. This Court thus has original jurisdiction over this action pursuant to 28 U.S.C. § 1331.

account was activated on March 8, 2013. *Id*. at 4. From 2013 to 2015, Uber updated the operative agreement four times.[4] *Id*. Each time Uber updated the agreement, O'Callaghan was asked to "assent to [a] revised [version] of the contract in order to receive continued access to the Uber App." *Id*. O'Callaghan was required to click "YES, I AGREE" to advance past the screen that contained the updated agreement. *Id*. at 3. Above "YES, I AGREE," the Uber App reminded O'Callaghan that "[b]y clicking below, you represent that you have reviewed all the documents above and that you agree to all the contracts above." *Id*. After clicking "YES, I AGREE," O'Callaghan was asked to confirm acceptance a second time by clicking "YES, I AGREE" again. *Id*. Only then was O'Callaghan able to access the Uber App.[5] *Id*.

Although the original agreement that O'Callaghan first signed in February 2013 did not include an arbitration provision, the subsequent four versions of the agreement that O'Callaghan allegedly accepted did. *Id.* at 4. The most recent agreement, updated in December 2015 ("December 2015 agreement"), provides as follows:

> i. How This Arbitration Provision Applies.
>
> This Arbitration Provision is governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. (the "FAA") and evidences a transaction involving interstate commerce. This Arbitration Provision applies to any dispute arising out of or related to this Agreement or termination of the Agreement and survives after the Agreement terminates. [ . . . ]
>
> Except as provided in Section 15.3(v), below, regarding the Class Action Waiver, such disputes include without limitation disputes arising out of or relating to interpretation or application of this Arbitration Provision, including the enforceability, revocability or

---

[4] The operative agreement was updated on July 31, 2013, September 11, 2014, March 24, 2015, and December 11, 2015. Declaration of Chad Dobbs in Support of Uber's Motion to Compel Arbitration ("Dobbs Decl."), Doc. 19, ¶ 13.

[5] According to Uber, the July 2013 agreement required clicking "YES, I AGREE" only once. Dobb's Decl. ¶ 9.

> validity of the Arbitration Provision or any portion of the Arbitration Provision. All such matters shall be decided by an Arbitrator and not by a court or judge. [ . . . ]
>
> Except as it otherwise provides, this Arbitration Provision also applies, without limitation, to all disputes between You and Uber, as well as all disputes between You and Uber's fiduciaries, administrators, affiliates, subsidiaries, parents, and all successors and assigns of any of them, including but not limited to any disputes arising out of or related to this Agreement and disputes arising out of or related to Your relationship with Uber, including termination of the relationship. [ . . . ]
>
> This Agreement is intended to require arbitration of every claim or dispute that lawfully can be arbitrated, except for those claims and disputes which by the terms of this Agreement are expressly excluded from the Arbitration Provision. [ . . . ]
>
> > ii. Limitations On How This Agreement Applies.
> >
> > The disputes and claims set forth below shall not be subject to arbitration and the requirement to arbitrate set forth in Section 15.3 of this Agreement shall not apply: [ . . . ]
> >
> > Claims for workers compensation, state disability insurance and unemployment insurance benefits; [ . . . ]

Declaration of Chad Dobbs in Support of Uber's Motion to Compel Arbitration ("Dobbs Decl."), Doc. 19 Ex. K § 15.3(i) and (ii) (emphasis omitted).

The agreement also notified O'Callaghan that he could opt out of the arbitration provision:

> > viii. Your Right To Opt Out Of Arbitration.
> >
> > Arbitration is not a mandatory condition of your contractual relationship with Uber. If You do not want to be subject to this Arbitration Provision, You may opt out of this Arbitration Provision by notifying Uber in writing of Your desire to opt out of this Arbitration Provision, which writing must be dated, signed and delivered by electronic mail to optout@uber.com, by U.S. Mail, or by any nationally recognized delivery service

> [ . . . ]
>
> Should You not opt out of this Arbitration Provision within the
> 30-day period, You and Uber shall be bound by the terms of
> this Arbitration Provision. [ . . . ]

*Id*. at Ex. K § 15.3(viii) (emphasis omitted).

Uber has provided evidence that O'Callaghan accepted the new terms on each occasion the terms were updated. *Id.* ¶ 13. In addition, O'Callaghan did not avail himself of the opt out provision on any such occasions. *Id.* ¶ 15.

## II.  PROCEDURAL BACKGROUND

O'Callaghan commenced the instant action on March 22, 2017. *See* Compl. Uber requested a pre-motion conference to discuss its anticipated motion to compel arbitration and dismiss complaint on September 22, 2017. *See* Letter Motion for Conference for Defendant's Anticipated Motion to Compel Arbitration and Dismiss Complaint, Doc. 11. O'Callaghan filed response to Uber's request on November 2, 2017. *See* Pl.'s Resp. At a conference held on November 9, 2017, Uber was granted leave to file a motion to compel arbitration of O'Callaghan's claims. On December 8, 2017, Uber filed its motion to compel arbitration. *See* Motion to Compel Arbitration, Doc. 17. O'Callaghan moved to deny arbitration and grant a jury trial on January 5, 2018. *See* Notice of Motion to Deny Arbitration and Grant Jury Trial ("Pl.'s Opp'n"), Doc. 21.

## III.  LEGAL STANDARD

### A. Federal Arbitration Act

Section 4 of the FAA requires courts to compel arbitration in accordance with the terms of an arbitration agreement upon the motion of either party to the agreement, provided that there

is no issue regarding its creation. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 354–355 (2011) (citing 9 U.S.C. § 4). Whether the parties agreed to arbitrate is generally a question decided by the court unless the parties "clearly and unmistakably provide otherwise." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986). Determinations of arbitrability may be delegated to an arbitrator "if there is clear and unmistakable evidence from the arbitration agreement, as construed by the relevant state law, that the parties intended that the question of arbitrability shall be decided by the arbitrator." *Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121 (2d Cir. 2003) (quoting *Bell v. Cendant Corp.*, 293 F.3d 563, 566 (2d Cir. 2002)) (internal quotation marks omitted). In the absence of clear and unmistakable evidence that the parties intended to submit the question of arbitrability to the arbitrator, courts assume they, not arbitrators, were intended to decide "certain gateway matters, such as whether the parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy." *Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 452 (2003). To determine whether to compel arbitration, the Court must weigh four primary considerations: "(1) whether the parties in fact agreed to arbitrate; (2) the scope of the arbitration agreement; (3) if the parties assert federal statutory claims, whether Congress intended those claims to be nonarbitrable; and (4) if the court concludes that some, but not all, of the claims in the case are arbitrable, whether to stay the balance of the proceedings pending arbitration." *Application of Whitehaven S.F., LLC v. Spangler*, 45 F. Supp. 3d 333, 342 (S.D.N.Y. 2014) (citing *JLM Indus., Inc. v. Stolt–Nielsen SA*, 387 F.3d 163, 169 (2d Cir. 2004)), *aff'd*, 633 Fed. Appx. 544 (2d Cir. 2015). "A party resisting arbitration on grounds that the arbitration agreement is invalid under a defense to contract formation, or that the arbitration contract does not encompass the claims at issue, bears the burden of proving such a defense." *Kulig v.*

*Midland Funding, LLC*, 13 Civ. 4715 (PKC), 2013 WL 6017444, at *2 (S.D.N.Y. Nov. 13, 2013).

Moreover, "federal policy strongly favors arbitration as an alternative dispute resolution process," thus, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," and "[f]ederal policy requires [courts] to construe arbitration clauses as broadly as possible." *Collins & Aikman Prods. Co. v. Building Sys., Inc.*, 58 F.3d 16, 19 (2d Cir. 1995) (internal citations and quotations omitted); *see also*, *e.g.*, *Champion Auto Sales, LLC v. Polaris Sales Inc.*, 943 F. Supp. 2d 346, 351 (E.D.N.Y. 2013) ("In keeping with this policy, the Court resolves doubts in favor of arbitration and enforces privately-negotiated arbitration agreements in accordance with their terms."). "[U]nless it may be said with positive assurance" that the arbitration clause does not cover the disputed issue, the court must compel arbitration. *Collins & Aikman Prods.*, 58 F.3d at 19 (quoting *David L. Threlkeld & Co. v. Metallgesellschaft Ltd. (London)*, 923 F.2d 245, 250 (2d Cir. 1991)).

Despite the federal policy favoring arbitration, courts only apply the "presumption of arbitrability" if an "enforceable arbitration agreement is ambiguous about whether it covers the dispute at hand." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 288 (2010); *see also Allstate Ins. Co. v. Mun*, 751 F.3d 94, 97 (2d Cir. 2014). "[D]oubts concerning the scope of an arbitration clause should be resolved in favor of arbitration," however, this "presumption does not apply to disputes concerning whether an agreement to arbitrate has been made." *Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth.*, 764 F.3d 210, 215 (2d Cir. 2014) (quoting *Applied Energetics, Inc. v. NewOak Capital Mkts., LLC*, 645 F.3d 522, 526 (2d Cir. 2011)). "It is the court's duty to interpret and construe an arbitration provision, but only where a contract is 'validly formed' and 'legally enforceable.'" *Kulig*, 2013 WL 6017444, at *2 (S.D.N.Y. Nov. 13,

2013) (citing *Granite Rock Co.*, 561 U.S. at 303).

### B. Summary Judgment

In ruling on motions to compel arbitration brought under the FAA, "the court applies a standard similar to that applicable for a motion for summary judgment." *Bensadoun v. Jobe–Riat*, 316 F.3d 171, 175 (2d Cir. 2003). Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (quoting *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). A fact is "material" if it might affect the outcome of the litigation under the governing law. *Id.* The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (quoting *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)) (internal quotation marks omitted). However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture, or surmise. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). To defeat a motion for summary

judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 256–57 (1986)).

In the case of a *pro se* plaintiff, the Court is obligated to construe the complaint liberally, *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011), and to interpret the claims as raising the strongest arguments that they suggest. *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (citing *Harris v. City of New York*, 607 F.3d 18, 24 (2d Cir. 2010)). However, this does not "relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003).

## IV. DISCUSSION

### A. Choice of Law

The issue of "whether or not the parties have agreed to arbitrate is a question of state contract law." *Whitehaven*, 45 F. Supp. 3d at 344 (quoting *Schnabel v. Trilegiant Corp.,* 697 F.3d 110, 119 (2d Cir. 2012)). The December 2015 agreement states, "the choice of law provisions . . . do not apply to the arbitration clause . . . , such arbitration clause being governed by the Federal Arbitration Act." Dobbs Decl. Ex. K § 15.1. In the absence of an applicable choice of law provision, "courts in New York apply a 'center of gravity' approach to determine the governing law in contract cases." *Mumin v. Uber Techs., Inc.*, 239 F. Supp. 3d 507, 522 (E.D.N.Y. 2017) (quoting *In re Frito-Lay N. Am., Inc.*, 12 Md. 2413 (RRM) (RLM), 2013 WL 4647512, at *18 (E.D.N.Y. August 29, 2013)). Under the "center of gravity" approach, courts "consider a spectrum of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter [of the contract], and the domicile or place of business of the contracting parties." *Id*. (quoting *Lazard Freres & Co. v. Protective*

*Life Ins. Co.*, 108 F.3d 1531, 1539 (2d Cir. 1997)).

Here, O'Callaghan is a New York resident that performed transportation services under the agreement for Uber in New York. *See* Compl. at 2; Def.'s Mem. at 1. The issue in dispute involves contract formation in New York. *See* Def.'s Mem. at 2–3. Thus, the Court finds that New York law governs.[6] *See Mumin*, 239 F. Supp. 3d at 522 (applying New York law in determining whether a valid agreement to arbitrate exists between a New York Uber driver and Uber).

### B. A Valid Agreement to Arbitrate Exists Between the Parties

The Court next analyzes whether there is a valid agreement between the parties to submit their dispute to arbitration. The question of whether O'Callaghan assented to the December 2015 agreement is one for this Court to decide, notwithstanding the delegation clause in the agreement. *See Saizhang Guan v. Uber Techs., Inc.*, 236 F. Supp. 3d 711, 720–721 (E.D.N.Y. 2017) ("[t]he more basic issue . . . of whether the parties agreed to arbitrate in the first place is one only a court can answer, since in the absence of any arbitration agreement at all, 'questions of arbitrability' could hardly have been clearly and unmistakably given over to an arbitrator." (quoting *VRG Linhas S.A. v. MatlinPatterson Glob. Opportunities Partners II L.P.*, 717 F.3d 322, 325 n.2 (2d Cir. 2013))). "To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound." *Id*. at 722 (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004)) (internal quotation marks omitted). Courts can infer acceptance when the party demonstrated at least constructive

---

[6] Uber contends that under either New York or California law, a valid agreement to arbitrate exists between the parties. The Court notes that New York or California laws are substantially similar regarding whether the parties have mutually assented to a contract term. *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017).

knowledge of the terms through his actions. *Id*. (citing *Hines v. Overstock.com, Inc.*, 380 Fed. Appx. 22, 25 (2d Cir. 2010). Regarding clickwrap agreements,[7] when the party had a sufficient opportunity to read the agreement and assented to the agreement through an unambiguous method provided, the party is found to have demonstrated constructive knowledge of the terms and is thus bound by the agreement. *Serrano v. Cablevision Sys. Corp.*, 863 F. Supp. 2d 157, 164 (E.D.N.Y. 2012); *see also Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 397 (E.D.N.Y. 2015) (finding that almost every district court to consider the issue "has found 'clickwrap' licenses, in which an online user clicks 'I agree' to standard form terms, enforceable.").

Here, the Court finds no genuine dispute that the parties are bound by the December 2015 agreement. Uber's electronic records show that O'Callaghan assented to four updated agreements, each of which contains the arbitration provision. Dobbs' Decl. ¶ 9, Ex. L. According to Uber, the only way through which O'Callaghan could have continued to access the Uber APP was to click "YES, I AGREE" each time the operative agreements were updated. *Id*. ¶¶ 9–10. O'Callaghan's evidence shows that he continued to drive for Uber throughout 2014 and 2015[8]. His bare assertion that he never assented to the arbitration provision yet continued to have access to the Uber App is without any factual basis.[9] Pl.'s Resp. at 1.

---

[7] In *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359 (E.D.N.Y. 2015), the court defined a clickwrap agreement as one that "require[s] a user to affirmatively click a box on the website acknowledging awareness of and agreement to the terms of service before he or she is allowed to proceed with further utilization of the website." *Id*. at 397 (quoting *United States v. Drew*, 255 F.R.D. 449, 462 n.22 (C.D.Cal. 2009). The Second Circuit adopted a similar definition in *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220 (2d Cir. 2016). *Id*. at 233 ("[A clickwrap agreement] typically requires users to click an "I agree" box after being presented with a list of terms or conditions of use."). This Court finds that the operative agreements in this case fulfill the aforementioned definition of a clickwrap agreement.

[8] O'Callaghan alleges that the accident occurred in February 2014 when he was on his way to pick up a client of Uber's. Compl. at 1. The two Form 1099-Ks O'Callaghan provided show that throughout 2014 and 2015, he continued to drive for Uber. *Id*. at Ex. B.

[9] O'Callaghan argues that the process through which he assented to the operative agreements did not comply with the Electronic Signatures in Global and National Commerce Act ("E-Sign Act") and thus the agreements are not enforceable. Pl.'s Opp'n. at 2. This Court finds that by clicking "YES, I AGREE," O'Callaghan electronically

O'Callaghan claims that he was never aware of the arbitration provision in these agreements. Pl.'s Resp. at 1. However, he was afforded sufficient opportunities to read them. Each time the agreement was updated, he was presented with a screen that clearly stated, "TO GO ONLINE, YOU MUST REVIEW ALL THE DOCUMENTS BELOW AND AGREE TO THE CONTRACTS BELOW." Dobb's Decl. ¶ 9; *id.*, Ex. A. The operative agreement was listed in a location near the center of the screen with a hyperlink. *Id.*, Ex. A. O'Callaghan could click on the hyperlink and scroll through the entire agreement for as long as he desired. *Id.* ¶ 9. After clicking "YES, I AGREE" the first time, O'Callaghan was asked to confirm that he "[had] reviewed all the documents and agree to all the new contracts." *Id.* Only after clicking "YES, I AGREE" the second time could O'Callaghan fully access the platform.[10] *Id.*

In *Kai Peng v. Uber Techs., Inc.*, 237 F. Supp. 3d 36 (E.D.N.Y. 2017), the plaintiffs, also Uber drivers, challenged whether they had voluntarily agreed to Uber's arbitration provision. Applying New York law, the court upheld the December 2015 agreement on the grounds that the process through which the plaintiffs purportedly agreed to the agreement provided the plaintiffs a sufficient opportunity to read it and an unambiguous method to assent to it. *See id.* at 48–49 (finding the agreement enforceable since "plaintiffs were required to *twice* click buttons labeled, 'YES, I AGREE,' and were clearly and repeatedly encouraged to click on the contract containing the terms to which they were agreeing"). The plaintiffs in *Kai Peng* assented to the same

---

signed the operative agreements. *See* 15 U.S.C. § 7006(5) ("The term 'electronic signature' means an electronic sound, symbol, or process, attached to or logically associated with a contract or other record and executed or adopted by a person with the intent to sign the record."). Such electronic signature cannot be "denied legal effect . . . simply because it is in electronic form." *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 26 n.11 (2d Cir. 2002) (quoting 15 U.S.C. § 7001(a)(1)); *see also* N.Y. State Tech. Law § 304 ("The use of an electronic signature shall have the same validity and effect as the use of a signature affixed by hand.").

[10] The July 2013 agreement required O'Callaghan to click "YES, I AGREE" only once. Dobb's Decl. ¶ 9.

December 2015 agreement in the same fashion as O'Callaghan in this case. *Id*. at 40–43.

O'Callaghan points out that the court in *Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454 (S.D.N.Y. 2017) struck down the arbitration provision in a similar clickwrap agreement entered into between the ride-share company Lyft, Inc. and its consumers. In *Applebaum*, the Uber's signup screen displayed a jumbo-sized pink "Next" bar at the bottom and the bold header "**Add Phone Number**" at the top. *Id*. at 466. The text "I agree to Lyft's terms of service," in contrast, was in the smallest font on the screen with "terms of service" marked in light blue on a white background, which made the hyperlink difficult to read. *Id*. at 466–467. Finding that the hyperlink was inconspicuous and that the signup screen did not indicate that there were contractual terms for the consumer to review, the court concluded that a reasonable consumer would not have understood that he or she had agreed to the terms of service. *Id*. at 467–468. The process in *Applebaum,* however, is clearly distinguishable from the process in this case. The process by which O'Callaghan assented to the December 2015 agreement provided him reasonable notice of the terms of the operative agreements. This Court therefore finds that O'Callaghan had constructive knowledge of the arbitration provision. The fact that O'Callaghan may have failed to review the contract carefully is not a valid defense. *See Kai Peng*, 237 F. Supp. 3d at 49–50 ("Failure to read a contract is not a defense to contract formation."); *see also Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 839 (S.D.N.Y. 2012) ("Failure to read a contract before agreeing to its terms does not relieve a party of its obligations under the contract.") (quoting *Centrifugal Force, Inc. v. Softnet Commc'n Inc.*, 08 Civ. 5463 (CM)(GWG), 2011 WL 744732, at *7 (S.D.N.Y. Mar. 1, 2011)). Accordingly, the Court concludes that the December

2015 agreement is enforceable.[11]

## C. Clear and Unmistakable Evidence of Intent to Delegate Arbitrability

The Court finds that there is clear and unmistakable evidence from the arbitration provision in the December 2015 agreement that the parties intended to submit the question of arbitrability to the arbitrator. The agreement specifically states that with the exception of a Class Action Waiver, "[all] disputes arising out of or relating to interpretation or application of this Arbitration Provision, including the enforceability, revocability or validity of the Arbitration Provision or any portion of the Arbitration Provision . . . shall be decided by an Arbitrator and not by a court or judge." Dobb's Decl. Ex. K § 15.3(i).

Courts have consistently held that such language clearly and unmistakably demonstrates the parties' intent to delegate the gateway questions. *See e.g., Guan*, 236 F. Supp. 3d at 727–29 (holding that the same agreement "clearly and unmistakably delegates the gateway issues to the arbitrator"); *Kai Peng*, F. Supp. 3d at 52–53 (same); *Mumin*, 239 F. Supp. 3d at 523 (same). Thus, it is left to the arbitrator to determine whether the arbitration provision in the December 2015 agreement applies to the dispute here, and specifically, whether O'Callaghan's claims are workers' compensation claims to which the arbitration provision does not apply. Pl.'s Resp. at 3;

---

[11] O'Callaghan claims that since the December 2015 agreement does not explicitly govern past disputes, he preserves the right to argue that earlier versions of the agreement should govern the current dispute. However, the Second Circuit has held that arbitration provisions should be applied to any preexisting claims provided the clauses are not expressly limited to future disputes. *See Coenen v. R.W. Pressprich & Co.*, 453 F.2d 1209, 1212 (2d Cir. 1972) (holding that arbitration under the New York Stock Exchange Rules applied to actions predating the signing of the contract by the petitioner because the contract stated that it governed "any controversy" between the parties); *see also Reid v. Supershuttle Intern., Inc.*, 08 Civ. 4854 (JG)(VVP), 2010 WL 1049613, at *5–6 (E.D.N.Y. Mar. 22, 2010) (following the Second Circuit ruling and applying the arbitration agreement retroactively); *Marcus v. Masucci*, 118 F. Supp. 2d 453, 457 (S.D.N.Y. 2000) (same). In any event that the arbitration provision in the December 2015 agreement is not applied retroactively to the dispute here, O'Callaghan was bound to the arbitration provision in the July 2013 agreement, which was the agreement in place in February 2014 when the accident occurred. *See* Compl. at 2; Dobb's Decl. ¶ 9. Its arbitration provision is materially identical to the arbitration provision in the December 2015 agreement. *See* Dobb's Decl. Ex. C; *id.,* Ex. K.

Dobb's Decl. Ex. K. § 15.3(ii) (providing the "Limitations On How This Agreement Applies").

Finally, O'Callaghan argues that the delegation clause is unconscionable. Pl.'s Resp. at 1, 3. Under New York law, a delegation clause is unconscionable only if it is "both procedurally and substantively unconscionable." *Mumin*, 239 F. Supp. 3d at 525 (quoting *Robinson v. Entm't One US LP*, 14 Civ. 1203 (AJN), 2015 WL 3486119, at *9 (S.D.N.Y. June 2, 2015)). When a party was afforded an opportunity to opt out, the agreement is not procedurally unconscionable. *See Id*. at 525 ("An agreement is not procedurally unconscionable if there is a meaningful opportunity to opt out.") (first citing *Valle v. ATM Nat'l, LLC*, 14 Civ. 7993 (KBF), 2015 WL 413449, at *6 (S.D.N.Y. Jan. 30, 2015; then citing *Teah v. Macy's Inc.*, 11 Civ. 1356, 2011 WL 6838151, at *6 (E.D.N.Y. Dec. 29, 2011)). Here, the December 2015 agreement clearly states that a driver may opt out of the arbitration provision by notifying Uber in writing within 30 days, Dobb's Decl. Ex. K § 15.3(viii), and Uber has provided evidence that thousands of drivers have, in fact, opted out of the arbitration provision. Dobb's Decl. ¶ 15. O'Callaghan, however, did not. *Id*. The Court thus concludes that the delegation clause is not procedurally unconscionable and may be enforced.

## V. CONCLUSION

For the reasons set forth above, Uber's motion to compel arbitration is GRANTED, and this action is STAYED pending arbitration. The Clerk of the Court is respectfully directed to stay this action pending arbitration and terminate the motions, Doc. 17 and Doc. 21.

SO ORDERED.

Dated: July 3, 2018
      New York, New York

                                                 Edgardo Ramos, U.S.D.J.